**FOR PUBLICATION**



**FILED**
Mar 08 2012, 8:52 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MELISSA J. HALEY**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PAMELA J. HENSLEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 63A01-1105-CR-195 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PIKE CIRCUIT COURT
The Honorable Robert L. Arthur, Senior Judge
Cause No. 63C01-1004-FD-258

**March 8, 2012**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Pamela J. Hensley ("Hensley") brings this discretionary interlocutory appeal from the trial court's denial of her motion to suppress. She raises one issue on appeal, which we restate as whether the search of Hensley's home violated her right to be free from unreasonable search and seizure guaranteed under the Fourth Amendment to the United States Constitution.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Hensley, who lives in a home at the North Side Trailer Court in Petersburg Indiana, is married to Robert Hensley ("Robert"). During the time in question, Robert was on probation through the Pike Circuit Court. The pertinent conditions of his probation provided that Robert "shall not possess or use any firearm" and "shall not consume or use any alcohol or controlled substance unless prescribed by a physician." [1] *Appellant's App.* at 34. An additional condition of probation "allow[ed] a Probation Officer to visit his home and conduct a warrantless search." [2] *Id*.

In April 2010, Corporal Chad Tharp ("Officer Tharp") of the Petersburg Police Department received a tip that Robert, who the officer knew to be on probation, was in

---

[1] Robert's written conditions of probation are not included in the record before us. Therefore, we refer to the conditions of probation described in the "State's Response to Defendant's Motion to Suppress." *Appellant's App.* at 34.

[2] In the State's response to Hensley's motion to suppress, the State contends that it was also a condition of probation that Robert "waive[] his right against *unreasonable* search and seizure by the Probation Officer or anyone acting on behalf of the Pike County Probation Department." *Appellant's App.* at 34 (emphasis added). We cannot confirm whether Robert agreed to such a condition; however, we note that our court has found such a condition to be unconstitutional. *See Fitzgerald v. State*, 805 N.E.2d 857, 865-66 (Ind. Ct. App. 2004) (such a provision is "invalid because it explicitly attempts to allow Probation Officers to perform *unreasonable* searches, even though it has repeatedly been stated that probationers enjoy a constitutionally protected right against such").

2

possession of marijuana. When deposed prior to trial, Officer Tharp could not recall who had provided the tip. *Appellant's App.* at 69-70. Officer Tharp took no action at that time. Three weeks after having received the marijuana tip, Officer Tharp was patrolling Hensley's neighborhood when someone approached him and said that Robert possessed a firearm. *Tr.* at 11. Officer Tharp understood that he "didn't have enough for a search warrant," so on April 22, 2010, he contacted the Chief Probation Officer of Pike County, Susan Stuckey ("Stuckey"). *Tr.* at 13. Based on the information supplied by Officer Tharp, Stuckey agreed to do a probation check that same day.

Stuckey went to Hensley's home, accompanied by Officer Tharp and a second Petersburg Police Officer, Chad McClellan ("Officer McClellan"). Officer Tharp assumed that because Robert and Hensley were married, they jointly owned the house and shared the bedroom. *Tr.* at 17. The police knew that Justin Williams, a former co-worker of Robert's, also had lived at the house. *Tr.* at 11, 23; *Appellant's Br.* at 3.

Robert was not at the residence when the officers arrived. Stuckey told Hensley that the purpose of the visit was to do a home check, and Hensley allowed them into the house because Robert was on probation. Stuckey initially helped Hensley put away her dogs, and as the two talked, Stuckey learned that only Hensley slept in the bedroom, and Robert slept in the living room.

When Officers Tharp and McClellan entered the home, they did not perform a safety sweep, nor did they inquire as to who owned or lived in the home; instead, they immediately began to search. While searching in the bedroom, Officer Tharp flipped the mattress and found a can containing a green, leafy substance, which was later determined

3

to be marijuana. He then opened "Pam Hensley's underwear drawer [and] in a ring box" found "an unknown tablet that was later identified by a pharmacist to be a generic form of Xanax." *Appellant's App.* at 90. In her deposition, Stuckey testified that it was not common in a probation check to look under mattresses or to search in a probationer's wife's "underwear drawer." *Id*. at 84, 90-91. No firearms were found during the search.

Stuckey, who had started her probation search at the front of the house, followed probation protocol and looked for anything in plain view, but saw nothing illegal or suspicious. *Tr*. at 26. Upon reaching the bedroom, Stuckey looked at the disarray in the bedroom and believed it had been "ransacked." *Id*.

Having found the marijuana and generic Xanax pill, the police obtained a search warrant and, thereafter, found "rolling papers," a "one[-]hitter pipe," and "two prescription bottles"—one with the name Jack Onyett and one with the name Pam Bailey. *Appellant's App.* at 56, 58. Based on the evidence obtained, the State charged Hensley with the following drug-related charges: (1) possession of a schedule IV controlled substance[3] as a Class D felony; (2) possession of a legend drug without a prescription,[4] a Class D felony; (3) maintaining a common nuisance[5] as a Class D felony; (4) possession of marijuana[6] as a Class A misdemeanor; and (5) possession of paraphernalia[7] as a Class A misdemeanor.

---

[3] *See* Ind. Code § 35-48-4-7(a).

[4] *See* Ind. Code § 35-43-10-3.

[5] *See* Ind. Code § 35-48-4-13(b)(2)(B).

[6] *See* Ind. Code § 35-48-4-11.

[7] *See* Ind. Code § 35-48-4-8.3(b).

Prior to trial, Hensley filed a motion to suppress the evidence seized during the search of her home. A hearing was held, and the trial court considered the parties' briefs and the published depositions of Officers Tharp and Stuckey before entering an order denying Hensley's motion to suppress. The trial court certified the order for interlocutory appeal, and this court accepted Hensley's interlocutory appeal. Hensley now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

On appeal, Hensley contends that the warrantless search of her home was illegal under the Fourth Amendment to the United States Constitution and, as such, that the evidence found during the search should have been suppressed. Specifically, she argues that the trial court abused its discretion by admitting the evidence obtained during the search because: (1) "[s]he was not the person on probation"; (2) "the search exceeded the scope and regulatory scheme of a probation search"; and (3) "the search was merely a pretext to conduct an investigatory search without first securing a warrant." *Appellant's Br.* at 1.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." *Micheau v. State*, 893 N.E.2d 1053, 1059 (Ind. Ct. App. 2008), *trans. denied* (2009). The Fourteenth Amendment makes this protection applicable to actions by state officials. *Allen v. State,* 743 N.E.2d 1222, 1227 (Ind. Ct. App. 2001) (citing *Elkins v. United States,* 364 U.S. 206, 213 (1960), *trans. denied*). "[A] search arises out of an intrusion by a governmental actor

upon an area in which a person maintains a 'reasonable expectation of privacy.'" *Holder v. State,* 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Katz v. U.S.,* 389 U.S. 347, 361(1967) (Harlan, J., concurring)). A constitutionally protected reasonable expectation of privacy exists where there is both a subjective expectation of privacy and societal recognition that such expectation of privacy is reasonable. *Id.* at 936.

Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Danner v. State*, 931 N.E.2d 421, 428 (Ind. Ct. App. 2010), *trans. denied.* However, the United States Supreme Court has determined that "the 'special needs' of a probationary system, particularly the need to supervise probationers closely, justifie[s] warrantless searches based on reasonable suspicion rather than probable cause." *State v. Schlechty*, 926 N.E.2d 1, 3-4 (Ind. 2010), *cert. denied*, 131 S. Ct. 934(U.S. 2011) (citing *Griffin v. Wisconsin,* 483 U.S. 868, 873–74 (1987)).

In *Schlechty*, our Supreme Court, citing to the reasoning of the United States Supreme Court, noted the two different ways in which a probation search may be analyzed under the Fourth Amendment:

> [A] warrantless probation search under *Griffin* may be justified on the basis of reasonable suspicion to believe a *probation violation has occurred* because, among other things, supervision of probationers is necessary to ensure that probation restrictions are in fact observed, and that the community is not harmed by the probationer being at large. *Griffin,* 483 U.S. at 873–75 []. By contrast, under [*United States v.*] *Knights,* [534 U.S. 112 (2001)]*,* even if there is no probationary purpose at stake, a warrantless search may be justified on the basis of reasonable suspicion to believe that the *probationer has engaged in criminal activity* and that a search condition is one of the terms of probation.

926 N.E.2d at 6 (emphasis added). A "probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Bonner v. State*, 776 N.E.2d 1244, 1248 (Ind. Ct. App. 2002) (citing *Griffin,* 483 U.S. at 873).

The concept of "'affording probationers lesser protections is predicated on the premise that probation officers, or police working with probation officers, are conducting searches connected to the enforcement of conditions of probation and not for normal law enforcement purposes.'" *Allen*, 743 N.E.2d at 1127-28 (quoting *Polk v. State,* 739 N.E.2d 666, 669 (Ind. Ct. App. 2000)). The State cites to *Griffin* in support of its position that this search did not violate the Fourth Amendment.

> In *Griffin,* the United States Supreme Court upheld the constitutionality of a warrantless search performed by a probation officer pursuant to a state regulation that authorized such searches on the basis of reasonable suspicion and articulated factors to be considered in determining the existence of reasonable suspicion. *See* 483 U.S. at 872–80. The Court concluded that the "special needs" of the probationary system, particularly the need to supervise probationers closely, justified warrantless searches based on reasonable suspicion rather than probable cause. *See id.* at 875 (noting "[s]upervision, then, is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large."). Accordingly, the Court determined that the search of the probationer's residence was reasonable within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers.

*Schlechty*, 926 N.E.2d at 3-4.

We begin by noting that the officers in *Griffin* searched the probationer's residence after receiving a tip that the probationer had a handgun. Unlike the facts in this case, the tipster in *Griffin* was a reliable source, and the search in *Griffin* was "carried out

7

entirely by the probation officers under the authority of Wisconsin's probation regulation." *Griffin*, 483 U.S. at 871. Here, the State does not cite to a probation regulation; instead, it contends that the "record in this case supports the trial court's determination that this was a probation search, not an investigatory search, and that it was reasonable." *Appellee's Br.* at 7. Our review of the record leads us to a different conclusion.

Officer Tharp testified that he received a tip from an unnamed source, who claimed that Robert had marijuana. Officer Tharp took no action based on this tip. About three weeks later, Officer Tharp received a tip that Robert had a firearm. Officer Tharp had not previously obtained information from this tipster and did not know his truthfulness; nevertheless, he contacted Stuckey. Based on the information supplied by Officer Tharp, Stuckey agreed to conduct a probation search of Robert's residence and agreed that Officers Tharp and McClellan could join her. Upon arriving at the residence, Stuckey announced to Hensley that the officers were there to do a probation search, and Hensley let the three officers into her home.

Officers Tharp and McClellan entered the house with Stuckey, but immediately began their own search while Stuckey spoke with Hensley. It was at this point that Officer Tharp and Officer McClellan's search ceased being a search to determine whether Robert had committed a probation violation. While Hensley was telling Stuckey that she slept in the bedroom and Robert slept in the living room, the other officers were in Hensley's bedroom overturning the mattress and pulling items out of Hensley's dresser drawers.

8

In her deposition, which was introduced at trial, Stuckey testified that the "standard[] for a home check for probation is that we can walk through the home and if [we] see, *in plain view*, evidence of illegal activity, then the house can be searched." *Appellant's App.* at 83 (emphasis added). Stuckey saw nothing in plain view, but while in the home, she was handed a tin by Officer Tharp that contained marijuana. Stuckey learned only later that the tin was found under Hensley's mattress. Stuckey testified that it was not standard practice in a probation search to look under a mattress and that she had not instructed the other officers to look under or in things. *Id*. at 94. She also testified that the disarray of the searched bedroom made her uncomfortable enough with the process that she left the home and stood outside while the officers completed their search. When asked why she was uncomfortable with the process, Stuckey testified:

> Because this is not the way that a probation home check is supposed to be handled. Judge Stratton, the judge that hired me, told me that a home check was not to be used as a back door for a warrant [] check.

*Appellant's App.* at 87. From this testimony, it is clear that Stuckey did not think that the search followed the protocol of a probation search.

The record before us also supports the conclusion that Officer Tharp was not conducting a probation search. During the suppression hearing, Officer Tharp gave the following testimony:

> Q.  Is it common to do a probation search where the probationer is not even present?
>
> A.  The who?
>
> Q.  The, the individual on probation. The probationer.

9

A.     Like I said, I don't know what they're, I don't know what they're, what they do down there at probation. I don't know what their, what they go by. What their standards are. Um, I believe they can search his residence anytime, whether he's there or not. In my opinion, I believe that's what it is.

. . . .

Q.     But before you began searching, did you ask any specific questions regarding ownership?

A.     Um, no.

*Tr*. at 16.

This evidence reveals that the search was not conducted as a probation search, nor was it truly conducted for probation reasons. Instead, the police were pursuing their own agenda and conducted an investigatory search under the guise that it was a probationary search. The search was prompted by the police officers, not by the probation officer. Stuckey agreed that the police could join her in the search, as officers often do for the reason of safety. Instead of acting as Stuckey's backup, however, the police entered the home and left Stuckey alone with Hensley, without conducting a safety sweep of the home that purportedly contained a firearm. The police did not ask Hensley about the ownership of the home and failed to follow the lead of Stuckey, from whom they could have learned that Robert slept in the living room and not the bedroom. This search did not meet the guidelines for a valid search under *Griffin*.

The State next contends that the search was proper under the analysis of *Knights*. Our Supreme Court analyzed *Knights* as follows:

[I]n [*Knights*], the United States Supreme Court expanded its holding in *Griffin* by declaring that searches performed in compliance with a search provision contained within a valid probation agreement may be

constitutional even if they were not "conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." *Knights*, 534 U.S. at 117. In *Knights,* the defendant was a probationer who challenged the constitutionality of the search of his home without a warrant. As a condition of probation, the defendant had signed a document that provided for police access to his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant for arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114. The defendant argued that the search was unconstitutional because police did not have a "special need" beyond normal law enforcement to support the warrantless search. *Id.* at 117–18. In essence the defendant argued the search was invalid because it was conducted for "investigatory" rather than "probationary" purposes. *Id.* at 116. A unanimous Court rejected this argument and concluded that the probationer's acceptance of a clear and unambiguous search condition "significantly diminished [the probationer's] reasonable expectation of privacy." *Id.* at 119–20. . . . [T]he Court concluded that the search was reasonable under its general Fourth Amendment approach of examining the totality of the circumstances "with the probation search condition being a salient circumstance." *Id.* Ultimately the Court determined that the warrantless search of the probationer's home was reasonable within the meaning of the Fourth Amendment because it was authorized by a condition of probation and supported by reasonable suspicion. Specifically the Court held "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.

*Schlechty*, 926 N.E.2d at 4-5.

To qualify as a constitutional search under *Knights*, the police would have needed to have reasonable suspicion that Robert had engaged in criminal activity. In the State's response to Hensley's motion to suppress, the State makes no mention of the reasoning in *Knights*, nor does it contend that these unsubstantiated tips provided "reasonable suspicion" to believe that Robert was engaging in criminal activity. Furthermore, the evidence found in Hensley's home was discovered under her bed and in her dresser

drawer. Hensley was not on probation nor was she the person suspected of criminal activity. The search by Officer Tharp, which uncovered the marijuana and generic Xanax violated her Fourth Amendment right against unreasonable search and seizure under *Knights*.[8]

We reverse the trial court's denial of Hensley's motion to suppress the evidence found during the search of her home, and remand for further action.

Reversed and remanded.

BARNES, J., and BRADFORD, J., concur.

---

[8] Because we find that the search was unconstitutional under the Fourth Amendment, we do not reach Hensley's claim that the search was also unconstitutional under Article I, section 11 of the Indiana Constitution.