# FOR PUBLICATION



FILED

Jun 11 2014, 10:07 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**BRUCE W. GRAHAM**
Graham Law Firm P.C.
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

STATE OF INDIANA,            )
                             )
    Appellant-Plaintiff,     )
                             )
        vs.           )   No. 79A04-1308-CR-407
                             )
BRISHEN R. VANDERKOLK,       )
                             )
    Appellee-Defendant.      )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Gregory J. Donat, Judge
Cause No. 79D04-1301-FD-6

**June 11, 2014**

**OPINION - FOR PUBLICATION**

**BARTEAU, Senior Judge**

Community corrections officers searched home detention participant Jordan Sullivan's residence and found contraband in the bedroom of his roommate Brishen Vanderkolk. Upon being charged with several offenses, Vanderkolk filed a motion to suppress. Evidence at the hearing showed that Sullivan had signed a waiver of his Fourth Amendment rights before beginning home detention and that the officers searched his residence to ensure he was complying with the program. The officers did not testify as to any reports of suspicious activity. The trial court granted the motion to suppress.

Caselaw from the U.S. Supreme Court as well as our Indiana courts leads us to conclude that Sullivan did not completely waive his Fourth Amendment rights. Because the Fourth Amendment required reasonable suspicion for the search, we affirm the court's grant of Vanderkolk's suppression motion.

## ISSUES

To determine whether the trial court erred by granting the motion to suppress, we examine: (1) whether Vanderkolk may challenge the constitutionality of the search predicated on Sullivan's waiver of his Fourth Amendment rights, and if so, (2) whether the search was justified by Sullivan's waiver.

## FACTS AND PROCEDURAL HISTORY

In April 2012, Sullivan began serving a sentence on home detention through Tippecanoe County Community Corrections. Before starting the program, he signed a form in which he "relinquish[ed]" his Fourth Amendment rights during his period of home detention:

The waiver of rights is limited to searches and seizures for any controlled substances, intoxicati[ng] liquor or deadly weapons as defined by Indiana law. I agree to submit to searches and seizures for such substances of my person, property and vehicle(s) at any time by any Community Corrections Staff, Law Enforcement Officer, and/or sentencing Court.

\* \* \* \* \*

I have been advised of my rights and understand that any Community Corrections staff, Law Enforcement Officer or Probation Officer may enter my residence at any time without prior notice to search upon probable cause.

State's Ex. 1.

In December 2012, TCCC officers conducted a search of Sullivan's residence to ensure he was complying with the program. One officer went up to the residence, made contact with someone there, and then signaled the other officers by radio that they could approach and begin searching the residence. As the other officers entered, a woman identified as Sullivan's girlfriend was to the right, and to the left, Sullivan was descending a staircase and said he was checking to see if his roommate was home.

Upon entering, the officers immediately noticed an odor of marijuana or spice being smoked. They also thought they heard a door being closed somewhere in the residence. Based on their standard protocol, the odor of illegal drugs, and the uncertainty as to who else was there, they did a protective sweep of the entire house. They observed contraband in plain view in the basement and on the second floor, which consisted of a single bedroom.

After the sweep showed no one else was in the residence, the officers conducted their search. Contraband was collected from the basement, the first floor bedroom, the

3

living room, and the second floor bedroom. The TCCC officers then contacted the Tippecanoe County Sheriff's Department to request a deputy to secure the evidence. The deputy arrived at the house, and the TCCC officers showed her the evidence. When she went outside to get her camera, she saw a man in a truck at the end of the driveway. As he started to back out, the deputy shined her light on him and talked with him. The man, later identified as Vanderkolk, said he lived in the second floor bedroom.

The State charged Vanderkolk with Class D felony maintaining a common nuisance, Class A misdemeanor dealing in marijuana, Class A misdemeanor possession of marijuana, and Class A misdemeanor possession of paraphernalia. Vanderkolk filed a motion to suppress. The evidence at the suppression hearing showed the TCCC officers searched the residence as a matter of protocol to ensure Sullivan's compliance with the program:

> Q     I[t's] my understanding that you came to Mr. Sullivan's and Mr. Vanderkolk's residence purely because you wanted to look around for safety or conduct – or compliance violations, is that correct?
> A     Yes.
> Q     Ok, so you hadn't received information of possible illegal activity there?
> A     No sir.
> Q     DTF, like drug task force didn't call and say we heard some suspicious things about this residence?
> A     No sir.
> Q     No neighbors were complaining about traffic or that type of thing out there?
> A     No sir.
> Q     Was this purely a random search for compliance and safety?
> A     Sir, I will state we don't do random searches; we do a search typically on everyone who enters the program to ensure compliance and ensure there is nothing in the residence when they begin. I cannot remember if this was soon after he entered the program or

4

later on, but we do typically search nearly everyone who enters our program.

Q    Well, this wasn't his initial search of the residence, was it?

A    I don't believe we searched him before this one.

\* \* \* \* \*

Q    Had [the lead officer] given you information that there were violations or problems at this house?

A    No sir, I believe that maybe some comment of suspicious activity, but I cannot recall for definite.  We did this search to ensure compliance and officer safety.

Q    Are you saying you have a report of suspicious activity or you don't know?

A    I don't know, sir.

Q    Ok.  So you can't articulate any reason that you were at this residence other than you wanted to be?

A    No sir, it was officer safety and ensuring compliance with the program.

Q    Well, what were the officers[ ] concerned about, safety wise?

A    Weapons, firearms, anything that can be used against us.

Q    I understand that generalized concern; but did you have any specific knowledge or facts that there may be weapons in this particular house?

A    No sir.

Q    So you just showed up?

A    Well –

Q    For no reason other than you wanted to be there?

A    As I said sir, we were ensuring compliance with the program.

Tr. pp. 58-60.  The trial court granted the suppression motion.  The State now appeals.

## DISCUSSION AND DECISION

The State contends the trial court erred by granting Vanderkolk's suppression motion.  In reviewing a trial court's ruling on a motion to suppress, we determine whether the record discloses substantial evidence of probative value that supports the trial court's decision.  *State v. Washington*, 898 N.E.2d 1200, 1203 (Ind. 2008).  We do not

reweigh evidence. *Id.* The State, appealing from a negative judgment, must show the trial court's grant of the suppression motion was contrary to law. *Id.*

## I. MAY VANDERKOLK CHALLENGE THE SEARCH?

The State contends the trial court erred by granting the suppression motion because Vanderkolk did not have "standing" to challenge Sullivan's waiver of his Fourth Amendment rights. It cites *Polk v. State*, 822 N.E.2d 239 (Ind. Ct. App. 2005), *trans. denied*. In that case, Polk was a passenger in a car that was pulled over for a traffic violation, and the driver gave consent to search the car. This Court concluded that Polk lacked "standing" to challenge the constitutionality of the manner in which the police obtained the driver's consent, noting that "Fourth Amendment rights are personal and may not be vicariously asserted." *Id.* at 245.

The State asks us to conclude that Vanderkolk, like Polk, could not challenge the constitutionality of the search because Vanderkolk, like Polk, was not the person who gave consent.

However, Polk lacked "standing" because he had no reasonable expectation of privacy in the driver's car, not because he was not the person who gave consent. This is the clear import of the case on which *Polk* relied, *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). There, the U.S. Supreme Court dispensed with the rubric of standing, instead subsuming it within the substantive analysis of a Fourth Amendment claim. *See id.* at 139 ("[T]he better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing."). The focus of the

6

inquiry was therefore "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it." *Id.* at 140. The Court explained:

> A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Id.* at 134 (citations omitted).

Here, Vanderkolk had a reasonable expectation of privacy in the residence because he lived there. He may thus challenge the search on Fourth Amendment grounds. *See Pollard v. State*, 270 Ind. 599, 388 N.E.2d 496, 502-03 (1979) (Brown could not challenge constitutionality of car search where he was merely an earlier passenger and was not even present at time of search; on the other hand, Pollard could challenge search because, as husband of the owner, he had legitimate expectation of privacy in wife's car).

## II. WAS THE SEARCH JUSTIFIED BY SULLIVAN'S WAIVER?

In the alternative, the State contends the trial court erred by granting the suppression motion because Sullivan consented to his residence being searched at any time when he signed the TCCC waiver of his Fourth Amendment rights. Vanderkolk responds that, despite the waiver, the Fourth Amendment nonetheless required the search to be supported by reasonable suspicion.

Community corrections programs and probation are similar in that both serve as alternatives to commitment to the Department of Correction and both are ordered at the

discretion of the trial court. *Cox v. State*, 706 N.E.2d 547, 549 (Ind. 1999). As with probation, placement in a community corrections program is a matter of grace and a conditional liberty that is a favor, not a right. *Id.*

Because of this similarity, our analysis of the search issue is controlled by *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987), and *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), both of which involved warrantless probationer searches.

In *Griffin*, a state regulation permitted probation officers to search a probationer's home without a warrant as long as it was approved by a supervisor and there were reasonable grounds to believe contraband would be found. The Court upheld a probation officer's warrantless search of a probationer's residence pursuant to this regulation, concluding that the supervision of probationers was a "special need" justifying warrantless searches of probationers based on reasonable suspicion rather than probable cause. 483 U.S. at 873-76.

*Knights* took a different approach. There, a probationer signed a document stating he would submit his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. at 114. The Court upheld a detective's warrantless search of the probationer's residence, concluding, "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring

8

that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.

The Indiana Supreme Court recently summarized both approaches to warrantless probationer searches:

> [A] warrantless probation search under *Griffin* may be justified on the basis of reasonable suspicion to believe a probation violation has occurred because, among other things, supervision of probationers is necessary to ensure that probation restrictions are in fact observed, and that the community is not harmed by the probationer being at large. *Griffin*, 483 U.S. at 873-75, 107 S. Ct. 3164. By contrast, under *Knights*, even if there is no probationary purpose at stake, a warrantless search may be justified on the basis of reasonable suspicion to believe that the probationer has engaged in criminal activity and that a search condition is one of the terms of probation. *Knights*, 534 U.S. at 122, 122 S. Ct. 587.

*State v. Schlechty*, 926 N.E.2d 1, 6 (Ind. 2010). In *Schlechty*, the Indiana Supreme Court upheld a warrantless search of a probationer's car where it was conducted reasonably, supported by a search condition contained in his terms of probation, and supported by reasonable suspicion to believe the probationer had engaged in criminal activity. *Id.* at 8.

It is clear from these cases that reasonable suspicion must support a warrantless search of a probationer or, here, a community corrections participant.

The State nonetheless cites *Samson v. California*, 547 U.S. 843, 857, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), in which the Court upheld the warrantless search of a parolee even in the absence of reasonable suspicion. But there, the Court added, "That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to

9

meet its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy." *Id.* at 855.

The Indiana Supreme Court in *Schlechty* concluded that this language strongly implied that suspicionless searches remained impermissible in jurisdictions requiring a level of individualized suspicion. 926 N.E.2d at 5 n.5. It stated, "Thus it appears that at least parolee searches are an example of instances in which the contours of a federal constitutional right are determined, in part, by the content of state law." *Id.* Had *Samson* been relevant to the analysis of Indiana warrantless probationer searches, the *Schlechty* Court would have upheld the search of the car on the mere fact it was owned by a probationer. *Samson* is inapplicable to this case.

The evidence at Vanderkolk's suppression hearing showed that the TCCC officers believed Sullivan's waiver justified suspicionless searches merely to ensure compliance. In this regard, the reason for the search was more akin to the "special needs" highlighted in *Griffin*. But the special need of supervising community corrections participants, while dispensing with probable cause, still required reasonable suspicion that evidence of Sullivan's noncompliance would be found. The State presented no such evidence at the hearing. Because the search was not supported by reasonable suspicion, we conclude that Vanderkolk's Fourth Amendment rights were violated. *See Nowling v. State*, 955 N.E.2d 854, 861 (Ind. Ct. App. 2011) (search of probationer's bedroom was not justified by

10

special needs of probation system because officers had no reasonable suspicion that probation violation occurred), *clarified on reh'g*, 961 N.E.2d 34 (2012), *trans. denied*.[1]

CONCLUSION

We therefore affirm the suppression.

BAILEY, J., concurs in result with separate opinion.

KIRSCH, J., dissents without opinion.

---

[1] Because the search was not supported by reasonable suspicion and thus violated Vanderkolk's Fourth Amendment rights, we need not address the parties' arguments about whether Sullivan had authority to consent to the search of Vanderkolk's bedroom, whether the officers validly entered Vanderkolk's bedroom during the protective sweep, or whether there was a violation of Article 1, Section 11 of the Indiana Constitution.

# IN THE
# COURT OF APPEALS OF INDIANA

STATE OF INDIANA,            )
                                  )
     Appellant-Plaintiff,      )
                                  )
          vs.               )     No.   79A04-1308-CR-407
                                  )
BRISHEN R. VANDERKOLK,    )
                                  )
     Appellee-Defendant.     )

**BAILEY, Judge, concurring in result.**

The lead opinion holds as unconstitutional the fruits of the search of Vanderkolk's room on the theory that the Community Corrections Officers' search of the house was unreasonable. While I concur in the result, I reach my conclusion on a different basis.

Under the Fourth Amendment to the United States Constitution, as interpreted by our courts, warrantless searches and seizures inside a home are <u>per se</u> unreasonable except in certain circumstances. <u>Krise v. State</u>, 746 N.E.2d 957, 961 (Ind. 2001) (citing <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980)). Where a search is conducted without a warrant, the State must bear the burden of proving that an exception to the warrant requirement existed at the time of the search. <u>Id.</u> There are numerous such exceptions. For example, evidence of a crime in plain view of a law enforcement officer is one such exception. <u>See</u>, <u>e.g.</u>, <u>Horton v. California</u>, 496 U.S. 128 (1990), and <u>Krise</u>, <u>supra</u>. So, too,

12

there is an exception to the warrant requirement where probable cause and exigent circumstances exist to permit a warrantless search. See, e.g., Welsh v. Wisconsin, 466 U.S. 740, 740-41 (1984) (noting that "no exigency is created simply because there is probable cause that a serious crime has been committed [and] application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause [for] only a minor offense").

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable." Hensley v. State, 962 N.E.2d 1284, 1288 (Ind. Ct. App. 2012) (citations and quotations omitted). And while voluntary and knowing consent to a search is another exception to the warrant requirement, Krise, 746 N.E.2d at 961, this court has held that waivers to Fourth Amendment rights as part of a probation program agreement are unconstitutional because such waivers allow probation officers to perform constitutionally unreasonable searches. Hensley v. State, 962 N.E.2d at 1286 n. 2. Special needs in administrative or other contexts may also permit a search with only reasonable suspicion that criminal activity may be occurring; most notably for our purposes, this has been held to be the case in the context of probation and community corrections programs. See U.S. v. Knights, 534 U.S. 112, 121-22 (2001) (holding that a search of a probationer's residence supported by reasonable suspicion is valid even when no probationary purpose is served); Griffin v. Wisconsin, 483 U.S. 868 (1987) (holding as valid a search for probationary purposes and supported by reasonable suspicion).

Reasonable suspicion does not rise to the level of probable cause. State v. Renzulli, 958 N.E.2d 1143, 1146 (Ind. 2011). In determining whether officers had reasonable suspicion, a court's inquiry focuses on whether officers have "a particularized and reasonable basis for suspecting legal wrongdoing." U.S. v. Arvizu, 534 U.S. 266, 273 (2002) (citations and quotations omitted). This requires more than "an inchoate and unparticularized suspicion or 'hunch,'" but rather "specific reasonable inferences which [a law enforcement officer] is entitled to draw from the facts in light of his experience." Terry v. Ohio, 392 U.S. 1, 28 (1968). Courts look to the totality of the circumstances in reaching a determination on the existence of reasonable suspicion. Renzulli, 958 N.E.2d at 1146.

When reviewing a trial court's grant of a motion to suppress evidence, our task on review is to determine "whether the record contains 'substantial evidence of probative value that supports the trial court's decision.'" State v. Gilbert, 997 N.E.2d 414, 417 (Ind. Ct. App. 2013) (quoting State v. Washington, 898 N.E.2d 1200, 1203 (Ind. 2008)). We do not reweigh evidence, and because the State appeals from a negative judgment, it must show that the trial court's decision to suppress evidence was contrary to law. Id. While we defer to the trial court's decisions on factual matters, we review de novo the trial court's determination of reasonable suspicion for a warrantless search. Sanders v. State, 989 N.E.2d 332, 334 (Ind. 2013).

While Officer Rebecca Georgene did not testify at the hearing, the record suggests that she was the first of four Community Corrections Officers who made contact with Sullivan at his home. The other three other officers remained near their cars and out of

14

view. The record then reveals that Officer Georgene signaled over the radio for Officers Adam Sowders, Kimberly Ledgerwood, and James Krogge to enter the house to conduct a protective sweep and search of the residence. After entering the house, Officer Sowders detected the scent of marijuana, and he saw Sullivan walking down the stairs that led to the attic where Vanderkolk's bedroom was located. Sullivan indicated that he was checking to see whether Vanderkolk—whom he identified as his roommate—was present, but Vanderkolk was not there. Sullivan also indicated to the officers that his bedroom was on the first floor of the residence. Officers Sowders and Krogge conducted their sweep from the basement, through the first floor, and finally up to Vanderkolk's bedroom, after being informed that Sullivan's roommate was not present and that the attic room did not belong to Sullivan.

Absent evidence of reasonable suspicion, the officers were without authority to search the home. Officer Georgene, who signaled other officers to search the home, did not testify at the suppression hearing; Officers Sowders and Krogge did. Officer Sowders testified that Community Corrections had no specific information on illegal activity at the residence, but that a search had not yet been performed of the house Sullivan and Vanderkolk shared. And we have no evidence in the record that establishes what, if anything, Officer Georgene detected that caused her to order the search. Nor is there evidence in the record that establishes that any of the officers received Sullivan's consent to search separate from the waiver Sullivan signed as part of the Community Correction program requirements—a waiver that, as prior cases have held, does not specifically

15

afford a blanket consent to search without at least reasonable suspicion on the part of law enforcement.

Thus, I would conclude that the State did not meet its burden of proving the existence of the kind of specific, articulable basis necessary to support a finding of reasonable suspicion sufficient to enter the house Vanderkolk shared with Sullivan. Accordingly, I would affirm the trial court's suppression of the evidence seized from Vanderkolk's room during both the protective sweep and the later search. But because I reach this conclusion on a slightly different basis from that of the lead opinion, I respectfully concur in result.